Ernestine **HUMBER**, Petitioner,

v.

Claude **MORTON**, Respondent.

No. B–352.

Supreme Court of Texas.

March 27, 1968.

Rehearing Denied May 1, 1968.

Jerry R. Hollingsworth, Amarillo, for petitioner.

Underwood, Wilson, Sutton, Heare & Berry, Harlow Sprouse, Amarillo, for respondent.

NORVELL, Justice.

The widow Humber brought suit against Claude Morton, alleging that Morton was in the business of building and selling new houses; that she purchased a house from him which was not suitable for human habitation in that the fireplace and chimney were not properly constructed and because of such defect, the house caught fire and partially burned the first time a fire was lighted in the fireplace. Morton defended upon two grounds: that an independent contractor, Johnny F. Mays, had constructed the fireplace and he, Morton, was not liable for the work done by Mays, and that the doctrine of "caveat emptor" applied to all sales of real estate. Upon the first trial of the case (which was to a jury), Mrs. Humber recovered a judgment which was reversed by the Eastland Court of Civil Appeals and the cause remanded for another trial because of an improper submission of the damage issue. 399 S.W.2d 831 (1966, no writ).[1]

1. The Court of Civil Appeals without discussion overruled a number of points which asserted that Morton was entitled to judgment as a matter of law.

Upon the second trial, defendant Morton filed a motion for summary judgment supported by affidavits, one of which referred to and incorporated therein the statement of the evidence adduced upon the first trial. Plaintiff likewise made a motion for summary judgment. Defendant's motion was granted and that of the plaintiff overruled. Such judgment was affirmed by the Court of Civil Appeals upon the holdings that Mays was an independent contractor and that the doctrine of implied warranty was not applicable to the case. 414 S.W.2d 765. Mrs. Humber, as petitioner, brought the case here, but we shall refer to the parties by their trial court designations.

It conclusively appears that defendant Morton was a "builder-vendor." The summary judgment proofs disclose that he was in the business of building or assembling houses designed for dwelling purposes upon land owned by him. He would then sell the completed houses together with the tracts of land upon which they were situated to members of the house-buying public. There is conflict in the summary judgment proofs as to whether the house sold to Mrs. Humber had been constructed with a dangerously defective fireplace chimney. Construction engineers who testified under oath for Mrs. Humber, as disclosed by the statement of facts upon the first trial which was made a part of the summary judgment record here, stated that the chimney was defective. Mr. Mays, who built the chimney, denied that his work was substandard or deficient in any way.

While there may be other grounds for holding that Mrs. Humber made a case to go to the jury, such as negligence attributable to Morton, failure to inspect and the like, we need not discuss these theories because we are of the opinion that the courts below erred in holding as a matter of law that Morton was not liable to Mrs. Humber because the doctrine of caveat emptor applied to the sale of a new house by a "builder-vendor" and consequently no implied warranty that the house was fit for human habitation arose from the sale.

Accordingly, we reverse the judgments of the courts below and remand the cause to the district court for a conventional trial upon the merits.

■ Mrs. Humber entered into a contract when she bought the house from Morton in May of 1964 and such house, together with the lot upon which it was situated, was conveyed to her. According to Morton, the only warranty contained in the deed was the warranty of title, i. e. "to warrant and forever defend, all and singular, the said premises unto the said Ernestine Humber, her heirs and assigns, * * *," and that he made no other warranty, written or oral, in connection with the sale. While it is unusual for one to sell a house without saying something good about it, and the statement that no warranty was made smacks of a conclusion, we shall assume that such conversation as may have taken place did not involve anything more than mere sales talk or puffing, and that no express warranties, either oral or written, were involved. However, it is undisputed that Morton built the house and then sold it as a new house. Did he thereby impliedly warrant that such house was constructed in a good workmanlike manner and was suitable for human habitation? We hold that he did. Under such circumstances, the law raises an implied warranty.

■ Preliminary to our discussion of the controlling issue in the case, the applicability of the caveat emptor doctrine, we should notice the reference of the Court of Civil Appeals to Article 1297, Vernon's Ann. Tex.Stats., which incidentally is not set out in the opinion, but is referred to by a quotation from Westwood Development Company v. Esponge, 342 S.W.2d 623 (Tex. Civ.App.1961, writ ref'd, n. r. e.). The statute is not deemed applicable here for a number of reasons. Article 1297 does not say that warranties as to fitness and suitability of structures upon land cannot arise unless expressed in the deed of conveyance. The article relates to covenants which may

or may not arise from the use of certain specific words in a conveyance, namely, "grant" or "convey." [2]

This article is part of Title 31, Revised Statutes, relating to conveyances. It relates to covenants of title which arise out of conveyances and not to collateral covenants such as the suitability of a house for human habitation. The presence of a collateral covenant of this type in a deed would be strange indeed. "It is not the office of a deed to express the terms of the contract of sale, but to pass the title pursuant to the contract." 26 C.J.S. Deeds § 1, p. 582. The article simply prescribes what covenants may be implied by the use of two designated words, "grant" or "convey." The implied warranty of fitness arises from the sale and does not spring from the conveyance.

■ It may be that the lower courts were striking at the nonstatutory doctrine of merger under which all prior negotiations with reference to a sale of land are said to be merged in the final transaction between the parties. The doctrine of merger, however, is a matter generally controlled by the intention of the parties. 26 C.J.S. Deeds § 91, p. 841. For example: A owns Blackacre and agrees with B to construct a house thereon and then conveys the house and lot to B after the house has been completed. There are numerous cases that an implied covenant or warranty to build in a workmanlike manner is not destroyed by the deed. See, e. g., Perry v. Sharon Development Co. [1937] 4 All E.R. 390 (CA); Jones v. Gatewood, 381 P.2d 158 (Okl.1963).

If the passage of a deed does not operate to extinguish a warranty, either expressed or implied, in the case of an uncompleted house, it is difficult to understand how the deed could operate to merge and thus destroy an implied warranty raised by law in the case of a sale of a completed new house. It would be a strange doctrine indeed for the law to raise an implied warranty from a sale and then recognize that such warranty could be defeated by the passage of title to the subject matter of the sale. The issue here is not whether the implied warranty was extinguished by a conveyance, but whether such warranty ever came into existence in the first place.

The cases which give some weight to the doctrine of merger in the implied warranty situation hold that the doctrine of caveat emptor applies to sales of real property, thus reducing the "merger" theory to the status of a "unicorn hunting bow." [3] The merger doctrine implies that there is something to merge.

■ It might further be pointed out that generally in Texas, the notion of implied warranty arising from sales is considered to be a tort rather than a contract concept. Decker & Sons v. Capp, 139 Tex. 609, 164 S.W.2d 828, 142 A.L.R. 1479 (1942); Putman v. Erie City Mfg. Co., 338 F.2d 911 (5th Cir.1964). As to warranties implied from contracts and strict liability in tort, see, Epstein, "Strict Liability in Tort—A modest Proposal," 70 W.Va.L.Rev. 1 (1967).

We return to the crucial issue in the case—Does the doctrine of caveat emptor

**2.** Article 1297:
"From the use of the word 'grant' or 'convey,' in any conveyance by which an estate of inheritance or fee simple is to be passed, the following covenants, and none other, on the part of the grantor for himself and his heirs to the grantee, his heirs or assigns, are implied, unless restrained by express terms contained in such conveyance:
"1. That previous to the time of the execution of such conveyance the grantor has not conveyed the same estate, or any

right, title or interest therein, to any person other than the grantee.
"2. That such estate is at the time of the execution of such conveyance free from incumbrances.
"Such covenants may be sued upon in the same manner as if they had been expressly inserted in the conveyance."

**3.** A broken and inoperative cross-bow which is as effective as a good weapon since no one has seen a unicorn since the time of Noah.

apply to the sale of a new house by a builder-vendor?

■ Originally, the two great systems of jurisprudence applied different doctrines to sales of both real and personal property. The rule of the common law—caveat emptor—was fundamentally based upon the premise that the buyer and seller dealt at arm's length, and that the purchaser had means and opportunity to gain information concerning the subject matter of the sale which were equal to those of the seller. On the other hand, the civil law doctrine—caveat venditor—was based upon the premise that a sound price calls for a sound article; that when one sells an article, he implies that it has value. 77 C.J.S. 1159, Sales § 315, Sales 275, Sales, 46 Am.Jur. 275, Sales § 87.

Today, the doctrine of caveat emptor as related to sales of personal property has a severely limited application. Decker & Sons v. Capp, supra; McKisson v. Sales Affiliates, 416 S.W.2d 787 (Tex.Sup. 1967); Putman v. Erie City Mfg. Co., supra; O. M. Franklin Serum Co. v. C. A. Hoover & Sons, 418 S.W.2d 482 (Tex. Sup.1967).

In 1884, the Supreme Court of the United States applied the doctrine of implied warranty, the antithesis of caveat emptor, to a real property situation involving false work and pilings driven into the bed of the Maumee River. The case of Kellogg Bridge Company v. Hamilton, 110 U.S. 108, 3 S.Ct. 537, 28 L.Ed. 86, arose in connection with the construction of a bridge. The Supreme Court, (the elder Mr. Justice Harlan writing), said:

"Although the plaintiff in error (Kellogg Bridge Company, defendant in the trial court) is not a manufacturer, in the common acceptation of that word, it made or constructed the false work which it sold to Hamilton. The transaction, if not technically a sale, created between the parties the relation of vendor and vendee. The business of the company was the construction of bridges. By its occupation, apart from its contract with the railroad company, it held itself out as reasonably competent to do work of that character. Having partially executed its contract with the railroad company, it made an arrangement with Hamilton whereby the latter undertook, among other things, to prepare all necessary false work, and, by a day named, and in the best manner, to erect the bridge then being constructed by the bridge company—Hamilton to assume and pay for such work and materials as that company had up to that time done and furnished. Manifestly, it was contemplated by the parties that Hamilton should commence where the company left off. It certainly was not expected that he should incur the expense of removing the false work put up by the company and commence anew. On the contrary, he agreed to assume and pay for, and therefore it was expected by the company that he should use, such false work as it had previously prepared. It is unreasonable to suppose that he would buy that which he did not intend to use, or that the company would require him to assume and pay for that which it did not expect him to use, or which was unfit for use. * * * In the cases of sales by manufacturers of their own articles for particular purposes, communicated to them at the time, the argument was uniformly pressed that, as the buyer could have required an express warranty, none should be implied. But, plainly, such an argument impeaches the whole doctrine of implied warranty, for there can be no case of a sale of personal property in which the buyer may not, if he chooses, insist on an express warranty against latent defects.

"All the facts are present which, upon any view of the adjudged cases, must be held essential in an implied warranty. The transaction was, in effect, a sale of this false work, constructed by a com-

pany whose business it was to do such work; to be used in the same way the maker intended to use it, and the latent defects in which, as the maker knew, the buyer could not, by any inspection or examination, at the time discover; the buyer did not, because in the nature of things he could not, rely on his own judgment; and, in view of the circumstances of the case, and the relations of the parties, he must be deemed to have relied on the judgment of the company, which alone of the parties to the contract had or could have knowledge of the manner in which the work had been done. The law, therefore, implies a warranty that this false work was reasonably suitable for such use as was contemplated by both parties. * * *"

In Texas, the doctrine of caveat emptor began its fade-out at an early date. In Wintz v. Morrison, 17 Tex. 369 (1856), involving a sale of personal property, the Texas Supreme Court quoted with approval the following from Story on Sales as to the trend of 19th century decisions:

"[T]he tendency of all the modern cases of warranty is to enlarge the responsibility of the seller, to construe every affirmation by him to be a warranty, and frequently to imply a warranty on his part, from acts and circumstances, wherever they were relied upon by the buyer. The maxim of *caveat emptor* seems gradually to be restricted in its operation and limited in its dominion, and beset with the circumvallations of the modern doctrine of implied warranty, until it can no longer claim the empire over the law of sales, and is but a shadow of itself. * * *"

As to the present personal property rule of implied warranties or strict liabil-

ity in tort, see, *Decker, Putman, McKisson* and *Franklin,* cited above.

While in numerous common law jurisdictions, the caveat emptor doctrine as applied to the vendor builder—new house situation has overstayed its time, it was said by way of dicta in a Texas Court of Civil Appeals case in 1944 that:

"By offering the (new) house for sale as a new and complete structure appellant impliedly warranted that it was properly constructed and of good material and specifically that it had a good foundation, * * *." Loma Vista Development Co. v. Johnson, Tex.Civ. App., 177 S.W.2d 225, l. c. 227, rev. on other grounds, 142 Tex. 686, 180 S.W. 2d 922.

This decision has been described as "a preview of things to come."[4]

The rapid sickening of the caveat emptor doctrine as applied to sales of new houses was exposed by the Miller-Perry-Howe-Weck-Jones-Glisan-Carpenter syndrome.[5] The history of this development is briefly set out in Carpenter v. Donohoe, 154 Colo. 78, 388 P.2d 399 (1964), and in more detail by Professor E. F. Roberts in "The Case of the Unwary Home Buyer: The Housing Merchant Did It," 52 Cornell Law Quarterly 835 (1967). See also, Williston on Contracts (3rd Ed. Jaeger) § 926A, wherein it is said: "It would be much better if this enlightened approach (implied warranty, Jones v. Gatewood, 381 P.2d 158 [Okl.]) were generally adopted with respect to the sale of new houses for it would tend to discourage much of the sloppy work and jerry-building that has become perceptible over the years." 7 Williston (3rd Ed.) p. 818; 1 Follmer and Friedman, Products Liability, § 5.03 [5] [b]; Stewart, "Implied Warranties in

---

4. 52 Cornell Law Quarterly 835, l. c. 841.

5. Miller v. Cannon Hill Estates, Ltd., [1931] 1 All E.R. 93 (K.B.); Perry v. Sharon Dev. Co., [1937] 4 All E.R. 390 (C.A.); Hoye v. Century Builders, Inc., 52 Wash.2d 830, 329 P.2d 474 (1958);

Weck v. A. M. Sunrise Construction Co., 36 Ill.App.2d 383, 184 N.E.2d 728 (1962); Jones v. Gatewood, 381 P.2d 158 (Okl. 1963); Glisan v. Smolenske, 153 Colo. 274, 387 P.2d 260 (1963); and Carpenter v. Donohoe, 154 Colo. 78, 388 P.2d 399 (1964).

the Sale of New Houses," Note, 26 U. Pitt.L.Rev. 862 (1965); Haskell, "The Case for an Implied Warranty of Quality in Sales of Real Property," 53 Geo.L.J. 633 (1965); Gibson and Lounsberry, "Implied Warranties—Sales of a Completed House," Comments, 1 Cal.Western L.Rev. 110 (1965); Smith, "Torts, Implied Warranty in Real Estate, Privity Requirement," Comment, 44 N.Car.L.Rev. 236 (1965); Ramunno, "Implied Warranty of Fitness for Habitation in Sale of Residential Dwellings," 43 Denver L.Rev. 379 (1966).

The Glisan case (Glisan v. Smolenske), 153 Colo. 274, 387 P.2d 260 (1963), was factually similar to the hypothetical example heretofore set out in this opinion. Smolenske had agreed to purchase a house from Gilsan while it was under construction. The court propounded and answered the implied warranty question, thusly:

"Was there an implied warranty that the house, when completed, would be fit for habitation? There is a growing body of law on this question, which, if followed, requires an answer in the affirmative.

"It is the rule that there is an implied warranty where the contract relates to a house which is still in the process of construction, where the vendor's workmen are still on the job, and particularly where completion is not accomplished until the house has arrived at the contemplated condition—namely, finished and fit for habitation. Weck v. A. M. Sunrise Construction Co., supra [36 Ill. App.2d 383, 184 N.E.2d 728]; Jones v. Gatewood, supra [381 P.2d 158]; Hoye v. Century Builders, Inc., 52 Wash.2d 830, 329 P.2d 474; Miller v. Cannon Hill Estates, Ltd., supra [2 K.B. 113]; Perry v. Sharon Development Co., Ltd., supra [4 All E.L.R.]; Jennings v. Tavenner, 2 All. E.L.R. (1955) 769; Dunham, "Vendor's Obligation as to Fitness of Land for a Particular Purpose," 37 Minn.L.Rev. 108 (1953). Contra: Coutraken v. Adams, 39 Ill.App.2d 290, 188 N.E.2d 780."

In the next year, 1964, the Colorado Supreme Court in Carpenter v. Donohoe, 154 Colo. 78, 388 P.2d 399, extended the implied warranty rule announced by it in *Glisan* to cover sales of a new house by a builder-vendor. The court said:

"That a different rule should apply to the purchaser of a house which is near completion than would apply to one who purchases a new house seems incongruous. To say that the former may rely on an implied warranty and the latter cannot is recognizing a distinction without a reasonable basis for it. This is pointedly argued in an excellent article, 'Caveat Emptor in Sales of Realty—Recent Assaults upon the Rule,' by Bearman, 14 Vanderbilt Law Rev. 541 (1960–61.)

"We hold that the implied warranty doctrine is extended to include agreements between builder-vendors and purchasers for the sale of newly constructed buildings, completed at the time of contracting. There is an implied warranty that builder-vendors have complied with the building code of the area in which the structure is located. Where, as here, a home is the subject of sale, there are implied warranties that the home was built in workmanlike manner and is suitable for habitation."

While it is not necessary for us to pass upon a situation in which the vendor-purchaser relationship is absent, the case of Schipper v. Levitt & Sons, 44 N.J. 70, 207 A.2d 314 (1965), is important as much of the reasoning set forth in the opinion is applicable here. The Supreme Court of New Jersey recognized "the need for imposing on builder-vendors an implied obligation of reasonable workmanship and habitability which survives delivery of the deed." This was a case in which a person other than a purchaser had been injured by a defective water heater which had been installed in a new house by Levitt, the builder-vendor. The opinion cited and quotes from Carpenter v. Donohoe but proceeded upon the theory of strict liability in

tort.[6] The court placed emphasis upon the close analogy between a defect in a new house and a manufactured chattel. The opinion states:

"The law should be based on current concepts of what is right and just and the judiciary should be alert to the never-ending need for keeping its common law principles abreast of the times. Ancient distinctions which make no sense in to-day's society and tend to discredit the law should be readily rejected as they were step by step in Henningsen [Henningsen v. Bloomfield Motors, 32 N.J. 358, 161 A.2d 69, 75 A.L.R.2d 1 (1960)] and Santor [Santor v. A and M Karagheusian, 44 N.J. 52, 207 A.2d 305, 16 A.L.R.3d 670 (1965)]. * * *

"When a vendee buys a development house from an advertised model, as in a Levitt or in a comparable project, he clearly relies on the skill of the developer and on its implied representation that the house will be erected in reasonably work-manlike manner and will be reasonably fit for habitation. He has no architect or other professional adviser of his own, he has no real competency to inspect on his own, his actual examination is, in the nature of things, largely superficial, and his opportunity for obtaining meaning-ful protective changes in the conveyanc-ing documents prepared by the builder vendor is negligible. If there is improper construction such as a defective heating system or a defective ceiling, stairway and the like, the well-being of the vendee and others is seriously endangered and serious injury is foreseeable. The pub-lic interest dictates that if such injury does result from the defective construc-tion, its cost should be borne by the re-sponsible developer who created the dan-

ger and who is in the better economic position to bear the loss rather than by the injured party who justifiably relied on the developer's skill and implied rep-resentation."

In Bethlahmy v. Bechtel, 415 P.2d 698 (Idaho 1966), it appeared that the trial court had rendered judgment in accordance with the 1959 holding of the Supreme Court of Oregon in Steiber v. Palumbo, a much cited case which is relied upon by the de-fendant here. The specific finding of the trial court was:

"There are no implied warranties in the sale of real property. Steiber v. Palumbo, 219 Oreg 479, 347 P.2d 978 [78 A.L.R.2d 440] (1959); Annot., 78 ALR 2d 446. The sale of this home carried with it, absent an express warranty, no promise that the floor would not leak."

The Idaho court was then called upon to deal with the Oregon decision and the later decisions of the Colorado Supreme Court in *Carpenter* and that of the New Jersey Supreme Court in *Schipper*. After a care-ful review of many decisions, including the Oregon, Colorado and New Jersey cases mentioned, the court said:

"The Schipper decision is important here because: (1) it illustrates the recent change in the attitude of the courts to-ward the application of the doctrine of caveat emptor in actions between the builder-vendor and purchaser of newly constructed dwellings; (2) it draws anal-ogy between the present case and the long-accepted application of implied war-ranty of fitness in sales of personal prop-erty; and (3) the opinion had the unani-mous approval of the participating jus-tices. * * *

6. It is said in the opinion that, "It is true, as Levitt suggests, that cases such as Carpenter (388 P.2d 399) involved direct actions by original vendees against their builder vendors and that consequently no questions of privity arose. But it seems hardly conceivable that a court recognizing the modern need for a vendee occupant's

right to recover on principles of implied warranty or strict liability would revivify the requirement of privity, which is fast disappearing in the comparable products liability field, to preclude a similar right in other occupants likely to be injured by the builder vendor's default. * * * "

"The foregoing decisions all (except the Hoye case) rendered subsequent to the 1959 Oregon decision, relied upon by the trial court, show the trend of judicial opinion is to invoke the doctrine of implied warranty of fitness in cases involving sales of new houses by the builder. The old rule of caveat emptor does not satisfy the demands of justice in such cases. The purchase of a home is not an everyday transaction for the average family, and in many instances is the most important transaction of a lifetime. To apply the rule of caveat emptor to an inexperienced buyer, and in favor of a builder who is daily engaged in the business of building and selling houses, is manifestly a denial of justice. See also, Loma Vista Development Co. v. Johnson (Tex.) 177 S.W.2d 225 (1943); Appendix to Staff v. Lido Dunes, Inc., 47 Misc.2d 322, 262 N.Y.S.2d 544, at 553 (1965)."

See also, Waggoner v. Midwestern Development, Inc., 154 N.W.2d 803 (So.Dak., 1967)

In September of 1967, the Houston Court of Civil Appeals handed down its opinion in Moore v. Werner, 418 S.W.2d 918 (no writ), in which, after citing a number of authorities, the court said:

"Many of the authorities cited involve personalty, but we see no reason for any distinction between the sale of a new house and the sale of personalty, especially in a suit between the original parties to the contract, one of whom constructed the house in question. It was the seller's duty to perform the work in a good and workmanlike manner and to furnish adequate materials, and failing to do so, we believe the rule of implied warranty of fitness applies. Hoye v. Century Builders, 52 Wash.2d 830, 329 P.2d 474, 476; Mann v. Clowser, 190 Va. 887, 59 S.E.2d 78, 84; 13 Am.Jur.2d, p. 29, Sec. 27."

* * *

If at one time in Texas the rule of caveat emptor had application to the sale of a new house by a vendor-builder, that time is now past. The decisions and legal writings herein referred to afford numerous examples and situations illustrating the harshness and injustice of the rule when applied to the sale of new houses by a builder-vendor,[7] and we need not repeat them here. Obviously, the ordinary purchaser is not in a position to ascertain when there is a defect in a chimney flue, or vent of a heating apparatus, or whether the plumbing work covered by a concrete slab foundation is faulty. It is also highly irrational to make a distinction between the liability of a vendor-builder who employs servants and one who uses independent contractors. Compare, Conner v. Conejo Valley Development Co., 61 Cal.Rptr. 333 (1967). The common law is not afflicted with the rigidity of the law of the Medes and the Persians "which altereth not," and as stated in Cardozo in "The Nature of the Judicial Process," pp. 150–151 (quoted in 415 P.2d 698):

"That court best serves the law which recognizes that the rules of law which grew up in a remote generation may,

7. In the vendor-builder situation, Professor Roberts seems inclined to agree with Mr. Bumble's estimate of the law and points out that when caveat emptor is retained with regard to the sale of new houses, the law seemingly concerns itself little with a transaction which may and often does involve a purchaser's life savings, yet may afford relief by raising an implied warranty of fitness when one is swindled in the purchase of a two dollar fountain pen. 52 Cornell L.Rev. 835. Similarly, in 111 Solicitors' Journal 22, l. c. 25 (London), it is pointed out that, "the purchaser buying a new house with legal assistance is often less well protected legally than the purchaser buying a chattel without legal assistance." It is further urged that, "The legal profession should have made it their business to insure proper protection for the purchaser without waiting for building societies to take the initiative" for their own protection since most builders "try to do a good job (but) the reputation of all may be injuriously affected by the low standards of a few."

in the fullness of experience, be found to serve another generation badly, and which discards the old rule when it finds that another rule of law represents what should be according to the established and settled judgment of society, and no considerable property rights have become vested in reliance upon the old rule. * * * " [8]

The caveat emptor rule as applied to new houses is an anachronism patently out of harmony with modern home buying practices. It does a disservice not only to the ordinary prudent purchaser but to the industry itself by lending encouragement to the unscrupulous, fly-by-night operator and purveyor of shoddy work.

The judgments of the courts below are reversed and the cause remanded for trial in accordance with this opinion.

GRIFFIN, J., notes his dissent.

---

8. See also, Holmes, Collected Legal Papers, p. 187, quoted in 16 Baylor L.Rev. 263, 277, viz.:

"It is revolting to have no better reason for a rule of law than that it was laid down in the time of Henry IV. It is still more revolting if the grounds upon which it was laid down have vanished long since, and the rule persists from blind imitation of the past."